## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:26-cv-00279

NORTHSTAR REFRIGERATION, INC.,

      Plaintiff,

v.

QUALITY ENGINEERING SOLUTIONS, LTD.,

      Defendant.

---

## FIRST AMENDED COMPLAINT

---

NorthStar Refrigeration, Inc., by and through SGR, LLC, pursuant to Fed. R. Civ. P. 3 & 15(a)(1), for its First Amended Complaint against Quality Engineering Solutions, Ltd. ("QES") alleges:

## INTRODUCTION

This matter involves the fraudulent transfer of assets, customer contacts, business leads, business opportunities, and business contracts from AVID Engineering to QES by the 100% owner of those entities in order to avoid paying amounts owed by AVID Engineering to Northstar Refrigeration, Inc. under a Colorado State District Court confession of judgment.

## PARTIES

1.     NorthStar Refrigeration, Inc. ("Northstar") is a Massachusetts corporation with a principal office address of 95 Camelot Drive, Unit 1, Plymouth, Massachusetts 02360.

2.      Northstar operates as a mechanical contractor for construction projects in multiple states.

3.      On information and belief, on November 5, 1999, Richard Allen ("Allen") formed Quality Engineering Solutions, Ltd. ("QES") as a purported Canadian corporation.  At all times relevant to this First Amended Complaint, Allen has remained the 100% owner of QES.

4.      On information and belief, at various times, QES existed only as a shell corporation because other entities owned 100% by Allen performed engineering services in several United States.

5.      On April 11, 2017, Allen formed QES (USA) LLC as a Colorado Limited Liability Company.  At all times relevant to this First Amended Complaint, Allen has remained the 100% owner of QES (USA) LLC.

6.      On April 17, 2017, Allen formed AVID Engineering, LLC ("AVID") as a Colorado Limited Liability Company with a principal office address of 201 Coffman St., 1621, and with a principal mailing address of P.O. Box 1621, Longmont, Colorado 80502.  At all times relevant to this First Amended Complaint, Allen remained the 100% owner of AVID.

7.      On December 20, 2017, AVID, through Allen, filed Articles of Amendment for QES (USA), LLC.

8.      On December 20, 2017, the same day as the Articles of Amendment for QES (USA), AVID, through Allen, filed a Statement of Trade Name of a Reporting Entity and changed the name of QES (USA) to AVID.

2

9.      QES has employed and employs engineers with licenses to practice engineering in Colorado and Massachusetts.

10.     Allen has served and does serve as the 100% owner, officer, manager, member, shareholder, and/or contracting agent for QES.

11.     Allen has served as an employed engineer for QES.

12.     Allen has served and does serve as the 100% owner, officer, manager, member, shareholder, and/or contracting agent for AVID.

13.     Allen has served as an employed engineer for AVID.

14.     AVID and QES have used nearly identical websites listing the identical personnel to perform the identical services for entities in the construction industry.

15.     Beginning in 2024, AVID began shifting its personnel, contracts, business opportunities, business contracts, and other resources to QES.

16.     In recent months, Allen has begun using QES as an active Canadian corporate entity.

17.     QES continues to provide engineering services throughout the United States in the same manner that AVID had provided such engineering services.

18.     QES exists and operates as the alter ego of AVID.

JURISDICTION AND VENUE

19.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between corporate citizens of different states and foreign states.

20.    This Court has general and specific jurisdiction over QES because it maintains offices and employees in Colorado and transacts business in Colorado.  *See* Colo. Rev. Stat. § 13-1-124.

21.    For purposes of federal diversity jurisdiction, an individual's state citizenship is equivalent to domicile.  *Smith v. Cummings*, 445 F.3d 1254, 1259 (10th Cir. 2006). "To establish domicile in a particular state, a person must be physically present in the state and intend to remain there." *Id*.  The place where a person lives and has his or her home establishes domicile.  *Mitchell v. U.S.*, 88 U.S. 350 (1874).

22.    No single factor can conclusively establish domicile. "[A] district court should consider the totality of the circumstances." *Middleton v. Stephenson*, 749 F.3d 1197 (10th Cir. 2014). "It's an all-things-considered approach, and any number of factors might shed light on the subject in any given case." *Id*.

23.    Among the factors to be considered are: (1) current residence; (2) voting registration and voting practices; (3) location of spouse and family; (4) location of personal or real property; (5) location of brokerage and bank accounts; (6) memberships in churches, clubs, unions and other organizations; (7) location of a person's physician, lawyer, accountant, dentist and stockbroker; (8) place of employment or business; (9) driver's license and automobile registration; and (10) payment of taxes. *Id*.

24.    Allen and his wife, Laura B. Allen, reside at 170 High Point Dr., Longmont, CO 80504.

25.    Allen and his wife own real and personal property in Colorado.

26.     Allen has banking and brokerage accounts in Colorado at Wells Fargo, 598 Summit Blvd., Broomfield, CO 80021.

27.     Allen's Bankruptcy Lawyer, Aaron J. Conrardy, has offices in Colorado at 2580 West Main Street, Suite 200, Littleton, CO 80120, (303) 296-1999, aconrardy@wgwc-law.com.

28.     Allen pays income taxes in the State of Colorado, at 1999 Broadway, MS 5012 DEN, Denver, CO 80202.

29.     Allen maintains an active Colorado license (No. PE0052781) to practice engineering in Colorado.

30.     Allen and AVID have filed for bankruptcy before this Federal District Court in Colorado.  *See* Case No. 25-17272-MER.

31.     As of the date of this pleading, Northstar has not confirmed whether Colorado voter registration records show Allen registered to vote in Colorado.

32.     In general, voter registration provides persuasive evidence of a person's citizenship in a particular state because an individual registering to vote often must usually declare, under penalty of perjury, that he has resided in the state for a period of time before registration and that the address provided for the registration reflects the registrant's only place of residence. *See Searle v. CryoHeart Lab'ys, Inc.*, No. 20-cv-03830-PAB, 2021 WL 1589268, at *2–3 (D. Colo. Apr. 22, 2021) (describing Colorado voter registration requirements and explaining why voter registration and voting practices are strong evidence of citizenship). Under 28 U.S.C. § 1332(a), therefore, QES remains a citizen of Colorado for purposes of diversity jurisdiction.

33.     This Court is the proper venue pursuant to 28 U.S.C. § 1391 because a substantial part of the events, actions, and/or omissions giving rise to these claims occurred in Colorado.

GENERAL ALLEGATIONS

34.     In 2023, TAC VEGA MA OWNER, LLC ("VEGA") decided to construct the Jushi Grow Facility in Lakeville, Massachusetts (the "Project").

35.     On or about August 24, 2023, VEGA and AVID entered into a Standard AIA Form of Agreement Between Owner and Design-Builder under the terms of which VEGA retained AVID as the Design-Builder for the Project.

36.      AVID subsequently produced the construction plans for the Project, and AVID became the engineer of record for the Project.

37.     On November 14, 2022, Northstar submitted a proposal to AVID to provide equipment and services as the mechanical subcontractor for the Project ("Proposal").

38.     On January 9, 2023, January 26, 2023, September 7, 2023, October 19, 2023, and December 5, 2023, AVID approved purchase orders submitted by Northstar to provide equipment and services for the Project.

39.     For several months thereafter, VEGA, AVID, and Northstar had repeated communications regarding AVID's faulty design specifications that resulted in the improper operation of equipment at the Project.

40.    In June 2024, VEGA hired an independent engineering firm to compare the work actually performed at the Project against AVID's design specifications and AVID's engineering plan set.

41.    The independent engineering firm found various engineering deficiencies in AVID's design and plan set.

42.    On June 4, 2024. Northstar filed a mechanics lien against the Project in the amount of $562,987.80 ("Lien").

43.    In August 2024, VEGA replaced AVID and hired a different engineering firm.

44.    At that time, Northstar began working with the replacement engineering firm to rectify the as-built drawings and to complete the Project.

45.    Northstar's work with the replacement engineering firm fell outside of the scope of work that Northstar committed to perform through AVID under AVID's designs and specifications.

46.    The work with the replacement engineering firm required Northstar to perform tasks that AVID had contracted with VEGA to perform.

47.    In August 2024, AVID stopped paying Northstar for work under AVID's work orders, plans, and specifications for the Project.

48.    In response to the Lien, VEGA began communicating directly with Northstar rather than communicating with Northstar only through AVID.

49.    VEGA and Northstar negotiated an agreement to release the Lien in exchange for payments to Northstar for work performed by Northstar that AVID had originally contracted to perform for VEGA.

50.    In August 2024, Northstar and VEGA and AVID Engineering reached an Agreement to Pay Subcontractor and to dissolve the Lien.

51.    In August 2024, VEGA and Northstar entered into an Agreement to Dissolve Mechanic's Lien and Perform Additional Work.

52.    The Agreement to Pay Subcontractor left a remaining amount that AVID owed to Northstar of $363,093.80.

53.    Beginning in October 2024, Northstar made demands on AVID for Payment of the remaining balance owed by AVID to Northstar.

54.    On October 10, 2024, Northstar's President, Travis Townsend, contacted Allen about the balance due to Northstar from AVID and offered to discuss next steps over the phone.

55.    On October 15, 2024, Townsend expressed by email to Allen his wishes to develop a payment plan for the amounts owed by AVID to Northstar.

56.    On October 15, 2024, Allen implicitly admitted the amounts that AVID owed to Northstar and responded by email, "When we get paid what is owed to us, you will be paid."

57.    Townsend replied to Allen that VEGA had paid Northstar to finish tasks that AVID failed to perform in order to complete the Project.

58.    On October 16, 2024, Townsend again requested a telephone conversation with Allen to clarify potential next steps.

59.    Allen replied to Townsend stating, "I am not sure what 'next steps' will do to improve the situation."

60.    Townsend responded to Allen and asked about expectations for payment and to confirm the balance will be fully paid by the end of 2024, or to propose a payment schedule that would work for both parties.

61.    On October 16, 2024, Allen replied to Townsend and copied his email to Arshita Aggarwal (legal.arshita@gmail.com).

62.    Townsend replied and asked Allen if Aggarwal represented Allen and AVID as an attorney.  If so, Towsend offered to have Northstar's attorneys communicate with AVID's attorney.

63.    On October 17, 2024, Allen responded that, "I think that Arshita speaking with your lawyer is a good idea."

64.    On October 28, 2024, Allen instructed Aggarwal to contact Northstar's attorney, Paul Godec.

65.    On October 29, 2024, Aggarwal contacted Godec about how Northstar would like to proceed.

66.    On October 30, 2024, Aggarwal asked Godec by email "can we connect now?"  Godec placed a call to Aggarwal that same day, but did not reach her.

67.    On October 31, 2024, Aggarwal emailed Godec and apologized for missing his call. Aggarwal offered to schedule a Zoom meeting with Godec for Friday, November 1, 2024.

68.    On November 1, 2024, Godec and Aggarwal connected via Zoom.

69.    On November 1, 2024, Aggarwal sent to Godec an invoice dated 09/01/24 from Northstar to AVID.  Aggarwal wrote, "Attaching the invoice I was referring to. I hope we can resolve this matter amicably to benefit of both our clients as discussed."

70.    On November 12, 2024, Godec responded to Aggarwal with a Customer Aging Report for the Project, which contained an additional invoice after September 1, 2024.  Godec stated his intent to pursue litigation on behalf of Northstar against AVID.

71.    On November 14, 2024, Allen emailed Townsend directly and stated his hope to receive a final payment from VEGA and requested that Townsend have the balancing company give responses to AVID's comments.

72.    On November 15, 2024, Allen again emailed Townsend directly and asked, "Can you please confirm whether you will help me with this."

73.    On November 18, 2024, Townsend emailed Allen and requested that he direct all questions to Godec.

74.    On November 18, 2024, Allen replied and asked Godec to ask Townsend (with Townsend copied) to answer the questions in the attachment with the hopes of obtaining further payment from VEGA. In the same message, Allen directly told Townsend that Allen got an attorney involved because of the "perceived threats from Northstar."

75.    On November 18, 2024, Godec replied to Allen's email and asked for communications exclusively through attorneys, unless Allen had terminated his relationship with Aggarwal.

76.    Allen replied to this email inquiry by stating, "I will just call the balancer myself."

77.    On November 18, 2024, Allen emailed Townsend and Charlie Kauss at VEGA (attorneys not copied).  In the email, Allen expressed his intentions to resolve the dispute amicably and outlined the outstanding invoices between AVID, VEGA, and Northstar.

78.    On December 4, 2024, Godec received an email from Aggarwal (with respective clients copied) that requested assistance from Northstar on items from a VEGA order to ensure payment from VEGA to AVID.

79.    On December 4, 2024, Godec replied by email to Aggarwal.  Godec again asked for clarification on whether Aggarwal represented AVID.  Godec also questioned whether Aggarwal kept raising the same concerns repeatedly only to delay the lawsuit without meaningful efforts to resolve the dispute.

80.    On December 5, 2024, Aggarwal responded to Godec and re-stated that AVID could not pay Northstar until VEGA paid AVID.  Aggarwal also communicated that legal action by Northstar could result in AVID's bankruptcy.

81.    On December 12, 2024, VEGA informed Northstar that VEGA did not intend to pay AVID another dollar.

82.    On December 15, 2024, Aggarwal again emailed Godec repeated her request that Northstar provide all outstanding invoices.

83.    On December 16, 2024, Godec responded to Aggarwal and reminded her that Northstar had twice identified and provided the requested information.  Godec also informed Aggarwal that VEGA had advised Northstar that VEGA would not make additional payments to AVID.

84.    Throughout November and December 2024, Aggarwal engaged in periodic communications with Godec regarding a possible resolution of the dispute.  During those discussions, Aggarwal repeatedly expressed a lack of information about the nature of the dispute.  Northstar perceived the expressed lack of information as blatantly untrue and an obvious stall tactic.

85.    During those communications, Aggarwal repeatedly claimed not to have received various invoices that Godec had already produced.

86.    In November and December 2024, Allen promised to make progress payments to Northstar as soon as AVID received payments from VEGA and from other projects.

87.    On January 8, 2025, Allen spoke with Townsend directly.  In those calls, Allen admitted that AVID owed every penny invoiced by Northstar to AVID.  In those calls, Allen promised to discuss a payment plan to pay Northstar for the admitted amounts owed, and Allen agreed that both AVID and Allen would provide security for the agreed payment amounts in any payment plan.

88.    Allen agreed to send a proposed payment plan on or before January 17, 2025, but failed to do so.

89.    On January 18, 2025, Allen acknowledged by email that he had intended to send a payment plan to Northstar, but that he had failed to do so. Allen's email admitted, "As I stated before, I know that AVID owes Northstar money.  I want to pay it, but at this moment in time I and the company are broke."

90.    On January 19, 2025, Townsend asked Allen if he had any upcoming opportunities that would get funds flowing.

91.    On January 19, 2025, Allen replied that AVID would become a subcontractor on a proposal and merely awaited a response from the primary consultant. Allen also stated that AVID had begun a lead generation initiative, which could generate immediate opportunities.

92.    On February 12, 2025, Allen sent an email to Northstar.  The email stated, in part, that despite months of promises to the contrary, Allen had begun the process to close AVID; that Allen had no money and that AVID's only account receivable remained with VEGA; that Allen might decide to have AVID file for bankruptcy; and that "I see no reason to negotiate a settlement or payments.  I couldn't agree to anything if I have nothing."

93.    During the months of negotiations, Allen transferred all leads, assets, business opportunities, and business contracts from AVID to QES.

94.    Despite repeated demands by Northstar on AVID and Allen, AVID and Allen had failed and refused to pay Northstar the balance owed of $363,093.80.

95.     From November 2024 until February 2025, Allen knowingly made various false statements to Northstar and intended that Northstar would temporarily refrain from filing suit in reliance on those false statements.

96.     During the repeated delays and false representations from November 2024 until February 2025, Allen fraudulently transferred from AVID to QES some or all of the assets and business opportunities possessed by AVID. Had such transfers not occurred, AVID and Allen would have had resources to pay amounts owed by AVID to Northstar.

97.     On March 20, 2025, Northstar filed a Complaint against AVID and Allen in the District Court, City & County of Broomfield (the "Prior Lawsuit").

98.     On April 9, 2025, Northstar properly severed the Summons and Complaint in the Prior Lawsuit on Allen at his home in Colorado.

99.     Counsel for AVID, Chad Lieberman, filed an Unopposed Motion for Extension of Time to Respond to Complaint until May 16, 2025.  The Court granted the Motion

100.    On May 15, 2025, Godec and Lieberman discussed a potential compromise of the Prior Lawsuit involving a payment plan secured by real property.

101.    On May 16, 2025, AVID filed a Second Unopposed Motion for Extension of Time to Answer until May 30, 2025.  The Court granted the Second Motion.

102.    From May 15, 2025, until June 6, 2025, Godec and Liberman engaged in settlement negotiations that resulted in a stipulation for Confession of Judgment.

103.    On June 20, 2025, the Court entered a stipulated Confession of Judgment in the Prior Lawsuit that required AVID to make a series of payments to Northstar for a total amount of $335,000.

104.    AVID and Allen made the first payment required under the Confession of Judgment.

105.    AVID did not make the second payment or any subsequent payments required under the Confession of Judgment.

106.    On November 6, 2025, AVID and Allen each filed a Notice of Bankruptcy Filings with the State District Court in the Prior Lawsuit.

107.    Thereafter, Townsend conducted an internet investigation and learned that Allen had begun operating under the entity QES, but that AVID and QES otherwise had the identical website, identical personnel, and identical customer base.

108.    Upon information and belief, Allen has transferred all assets, business contacts, and contracting opportunities from AVID to QES.

109.    Upon information and belief, Allen has successfully diverted business and contracting opportunities from AVID to QES.

110.    Despite demands by Northstar and Townsend to Allen, Allen has refused to discuss settlement for the amounts owed in the Confession of Judgment with payments from funds from the business contracts diverted by Allen from AVID to QES.

**FIRST CLAIM FOR RELIEF**
**Piercing the corporate veil**

111.    Northstar incorporates by this reference as if fully repeated herein the allegations of ¶¶ 1 through 110, above.

112.    Colorado law permits piercing of the corporate veil in extraordinary circumstances. *In re Phillips*, 139 P.3d 639, 641 & 643 (2006); *Leonard v. McMorris*, 63 P.3d 323, 330 (Colo. 2003). Piercing of the corporate veil occurs when a trial court disregards the corporate form and attaches liability on individual shareholders for the obligations of the corporation. *In re Phillips*, 139 P.3d at 641 & 643; *Contractors Heating & Supply Co. v. Scherb*, 432 P.2d 237, 239 (1967).

113.    Colorado law also recognizes reverse piercing of the corporate veil when a plaintiff seeks to disregard the separate existence of a corporation and obtain the assets of another corporate entity due to the actions of a dominant shareholder or other corporate insider. *In re Phillips*, 139 P.3d at 644-45; *see also Zahra Spiritual Trust v. United States*, 910 F.2d 240, 244 (5th Cir.1990).

114.    Under Colo. Rev. Stat. § 13-25-127(1), "the burden of proof in any civil action shall be by a preponderance of the evidence," and this burden of proof applies in cases in which a party seeks to pierce the corporate veil. *McCallum Family L.L.C. v. Winger*, 221 P.3d 69, 72-73 (Colo. App. 2009).

115.    Piercing penetrates the corporate veil and imposes liability on individual shareholders or related corporations for the obligations of a corporation. *In re Phillips*, 139 P.3d at 655; *Contractors Heating & Supply Co.*, 163 Colo. at 587-88, 432 P.2d at 239. Individual or alternate corporate liability becomes appropriate when the corporation serves merely as the alter ego of the principal shareholder, *Great Neck Plaza, L.P. v. Le Peep Rest., L.L.C.*, 37 P.3d 485, 490 (Colo. App. 2001), and the shareholder used the corporate structure to perpetuate a wrong. *Micciche v. Billings*,

727 P.2d 367, 373 (Colo.1986); *In re Phillips*, 139 P.3d at 655.  In such circumstances, the courts may ignore the independent existence of the business entity and pierce the corporate veil to achieve an equitable result.  *In re Phillips*, 139 P.3d at 655; *Leonard*, 63 P.3d at 330; *Water, Waste & Land, Inc. v. Lanham*, 955 P.2d 997, 1004 (Colo. 1998).

116.   An alter ego relationship exists when a corporate entity serves as a mere instrumentality for the transaction of the owner's own affairs, and unity exists for the interest in ownership such that the separate personalities of the corporate entity and the owner no longer exist.  *In re Phillips*, 139 P.3d at 655; *Krystkowiak v. W.O. Brisben Co., Inc.*, 90 P.3d 859, 867 n.7 (Colo. 2004); *Gude v. City of Lakewood*, 636 P.2d 691, 697 (Colo. 1981).

117.   Whether a unity of interest exists to allow a court to disregard the corporate fiction and treat the corporation and shareholder as alter egos, involves whether (1) the corporation operates as a distinct business entity, (2) funds and assets are commingled, (3) adequate corporate records are maintained, (4) the nature and form of the entity's ownership and control facilitate misuse by an insider, (5) the business is thinly capitalized, (6) the corporation is used as a "mere shell," (7) shareholders disregard legal formalities, and (8) corporate funds or assets are used for noncorporate purposes. *In re Phillips*, 139 P.3d at 655; *Leonard*, 63 P.3d at 330; *see also Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156 (D. Colo. 1990); Winger, 221 P.3d at 74.

118.    The court's second inquiry involves whether justice requires recognizing the substance of the relationship between the shareholder and corporation over the form because the owner used the corporate fiction "to perpetrate a fraud or defeat a rightful claim." *In re Phillips*, 139 P.3d at 655 (quoting *Contractors Heating & Supply Co.*, 163 Colo. at 588, 432 P.2d at 239); *Winger*, 221 P.3d at 74. Courts may pierce the veil when the owner uses the corporate form to shield dominant improprieties.    *In re Phillips*, 139 P.3d at 655.

119.    Third, the court must evaluate whether an equitable result will be achieved by disregarding the corporate form and holding the shareholder or another entity liable for the acts of the business entity. *In re Phillips*, 139 P.3d at 655; *Water, Waste & Land, Inc.*, 955 P.2d at 1004. Achieving an equitable result is the paramount goal of traditional piercing of the corporate veil.    *In re Phillips*, 139 P.3d at 655; *Contractors Heating & Supply Co.*, 163 Colo. at 588, 432 P.2d at 239; *Winger*, 221 P.3d at 74.

120.    Colorado precedents have recognized piercing the corporate veil may impose individual liability on non-shareholder corporate insiders, including corporate officers and managers of limited liability companies. *Winger*, 221, P.3d at 74; *see also In LaFond v. Basham*, 683 P.2d 367, 369-70 (Colo. App. 1984); *Sheffield Servs. Co. v. Trowbridge*, 211 P.3d 714, 721-22 (Colo. App. 2009); 1 Fletcher, Cyclopedia of Corporations §§ 41, 41.1, 41.10. A court may hold a party liable when the party exercises an extensive level of control over the corporation. *Winger*, 221, P.3d at 75; *LaFond*, 683 P.2d at 369-70; 1 Fletcher, Cyclopedia of Corporations § 41.10, at 141; Krendl & Krendl, 55 Den. L.J. at 25-27 ("domination should be addressed as a threshold

question; if it is found to exist, one can then move on to the issue of whether the domination was used for an improper purpose").

121. Allen used the corporate entity of QES as an alter ego of AVID.

122. Allen did not operate QES as a distinct business entity from AVID.

123. Allen commingled the assets of AVID and the assets of QES.

124. QES did not maintain adequate corporate records for the assets, funds, customers, business contacts, and business contracts that QES obtained from AVID.

125. The nature of QES's ownership and control facilitated Allen's misuse of AVID's assets.

126. Allen allowed QES to become thinly capitalized.

127. Allen allowed QES to become a "mere shell."

128. Allen disregarded the corporate formalities of AVID and QES.

129. Allen improperly used corporate funds and assets of AVID for QES's purposes and to the detriment of Northstar. Justice requires the Court to disregard the substance of the relationship between Allen and QES and to hold QES liable because the corporate fiction of QES has perpetrated fraud in an attempt to defeat Northstar's rightful claims.

130. In other words, the corporate entity of QES now purports to justify a wrong, fraud, or crime against Northstar, where equity requires full payment to Northstar under the Confession of Judgment.

131. The Court will only achieve an equitable result by disregarding QES's corporate form and by holding QES liable for AVID's unlawful acts against Northstar.

132.    Accordingly, this Court must disregard the corporate fiction of QES and allow Northstar to recover against QES for the amounts owed in the Confession of Judgment.

133.    Northstar requests this Court to pierce the corporate veil and to impose the obligations under the Confession of Judgment on QES.

**SECOND CLAIM FOR RELIEF**
**Civil Theft**

134.    Northstar incorporates by this reference as if fully repeated herein the allegations of ¶¶ 1 through 133, above.

135.     AVID possessed funds for the payment of Northstar under the Confession of Judgment.

136.    AVID did not pay Northstar under the Confession of Judgment.

137.    Upon information and belief, Allen and AVID have transferred to QES funds possessed by them for payment of amounts owed to Northstar.

138.    Northstar may maintain a civil action for civil theft against QES in whose possession Northstar finds the funds.  *See* Colo. Rev. Stat. § 18-4-405.

139.    By possessing funds available to pay Northstar without paying Northstar, QES has proximately caused Northstar injuries, damages, and losses.

140.    QES owes Northstar general compensatory damages, such as unpaid amounts owed, as well as special or consequential damages, such as lost earnings and lost business opportunities.

141.    In such an action for civil theft, Northstar may additionally recover "three times the amount of the actual damages sustained by [it], … and may also recover costs of the action and reasonable attorney fees[.]"  *Id*.

142.    QES additionally owes Northstar pre and post judgment interest on all damages for breach of the Confession of Judgment awarded at the rate of nine percent annually.  *See* Colo. Rev. Stat. § 13-21-101.

WHEREFORE, Northstar respectfully requests and prays this Court for an Order in favor of Northstar and against QES awarding to Northstar the following:

A.    Damages for the amounts owed under the Confession of Judgment.

B.    Damages for Civil Theft perpetuated by QES against Northstar, including triple damages and attorneys' fees and costs of litigation.

C.    Piercing the corporate veil of QES to enter judgment against QES for the amounts owed under the Confession of Judgment.

D.    Such other, further, and different relief as the Court deems just and proper under the circumstances.

DATED this 5th day of February 2026.

Respectfully submitted,

**PAUL D. GODEC**

*By: /s/ Paul D. Godec*
SGR, LLC
3900 E. Mexico Ave., Suite 700
Denver, CO  80210
Phone: 303-320-0509
Fax: 303-320-0210
E-mail: pgodec@sgrllc.com
*Attorney for Northstar Refrigeration, Inc.*

Plaintiff's address:
NorthStar Refrigeration, Inc.
95 Camelot Drive, Unit 1
Plymouth, Massachusetts 02360

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 5th day of February 2026, the foregoing **FIRST AMENDED COMPLAINT** was filed and served via this Court's efiling system on the following:

Chad Lieberman
Lieberman Legal LLC
6437 South Dallas Court
Englewood, CO 80111
chad@lieberman-legal.com

/s/ Mariel Juniper
Mariel Juniper, Paralegal